NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

In Re the Matter of:

ABBY GERGEN-OLIVAS, *Petitioner/Appellant*,

*v.*

JOSHUA HECOCKS, *Respondent/Appellee.*

ROBERT HECOCKS and BARBARA HECOCKS, *Intervenors/Appellees.*

No. 1 CA-CV 25-1012 FC

FILED 08-14-2026

Appeal from the Superior Court in Maricopa County
No.  FC2020-051764
The Honorable Colleen E. O'Donnell-Smith, Judge

**AFFIRMED**

COUNSEL

Abby Gergen-Olivas, Protected
*Petitioner/Appellant*

Joshua Hecocks, Scottsdale
*Respondent/Appellee*

Benjamin Legal, P.C., Phoenix
By Sophie Altman
*Counsel for Intervenors/Appellees*

---

**MEMORANDUM DECISION**

Judge D. Andrew Gaona delivered the decision of the Court, in which Presiding Judge Jennifer M. Perkins and Judge Brian Y. Furuya joined.

---

**G A O N A**, Judge:

¶1 Abby Gergen-Olivas ("Mother") appeals the superior court's order granting third-party visitation to Robert and Barbara Hecocks ("Grandparents"). Because the superior court didn't abuse its discretion in granting visitation to Grandparents based on the record before it, we affirm.

**FACTS AND PROCEDURAL HISTORY**

¶2 Mother and Joshua Hecocks ("Father") were never married but share one minor child born in 2019. In 2020 Mother reported concerns that Father was abusing the child. DCS investigated and closed the case. Nothing in our record suggests that DCS found Mother's concerns substantiated.

¶3 In 2022, the court appointed a therapeutic interventionist to "manage[] the family during the process of reunification." The interventionist recommended joint legal decision-making with visitation for Father and gradual "introduction of grandparents and extended family." That same year, the court awarded Mother and Father joint legal decision-making with Mother having final decision-making authority. It also ordered that child reside with Mother, with Father exercising parenting time two evenings a week.

¶4 After a series of motions to modify, the court adopted Mother and Father's agreement under Arizona Rule of Family Law Procedure 69. Under that agreement, Mother had sole legal decision-making and Father had no parenting time.

¶5 Grandparents then petitioned for visitation. According to their petition, Mother and Father lived near Grandparents after the child's birth, and Grandparents saw the child often (primarily on holidays and while Mother and Father vacationed). But since the "breakdown in [Mother] and [Father]'s relationship" Mother wasn't permitting them to see the child, which they alleged was "devastating." Grandparents requested phone and video calls with the child, and in person visits "a minimum of

four times a year" on "weekends or school breaks" to "not adversely impact the child's customary activities."

¶6 Mother objected. Though Mother acknowledged that Grandparents visited child on holidays and babysat while she and Father vacationed, she claimed "they [now] couldn't be trusted and that they were protecting [Father] over [the] minor child's best interest[s]." Mother also noted that a previous therapeutic interventionist felt the child needed to establish a relationship with Father "prior to reintroduction [of the] paternal grandparents." And she argued that if the court allowed Grandparents visitation, she'd like it to be supervised by the former therapeutic interventionist or another neutral party.

¶7 The court held an evidentiary hearing at which Mother and Grandparents testified. Grandmother testified that Grandparents babysat on weekends and overnight when the child was young when Mother and Father lived nearby in California. She explained that after Mother and Father separated, she "attempt[ed] to maintain contact" by texting Mother to see the child and sending letters and gifts to the child. Their last in-person visit with the child was in January 2024 and "went great"; they played at a park, went to a pottery painting place, went to the mall, had dinner, and "celebrated a belated Christmas." Grandmother also testified that Mother was "a good mom," that she had no concerns about Mother's parenting, and that Grandparents just wanted to be part of the child's life. She said they were "willing to be very flexible with any visitation" even traveling to Arizona for visits if the court saw fit. And she felt that visitation "[e]very quarter" would be appropriate.

¶8 During Grandmother's testimony, Grandparents sought to admit letters they sent to the child. Mother objected, claiming that she didn't get the letters in disclosure before the hearing. Grandparents' counsel noted that the letters were listed on the pretrial statement and proffered that "[t]hey were in [the] exhibit link," confirming on the record that she'd emailed the exhibit containing the letters to Mother. The court admitted the exhibit.

¶9 Grandfather confirmed that he and Grandmother often helped care for the child when Mother and Father lived near them. He testified that they would "agree to conditions ensuring that [Father] cannot appear or contact the child during [their] visitation." Grandfather also explained that the most recent visit they had with the child in January 2024 "was such a great day," "felt like [they] were making a step forward in the right direction," and confirmed that their relationship was "something

[they] would be able to pick up again." He explained that their conversations with Mother about the child didn't include Father and were civil, friendly, and cordial both before and after the 2024 visit. He agreed that Mother "is a great mother" and confirmed Grandparents' willingness "to be flexible with visits" so visitation wouldn't disturb Mother's or the child's schedules.

¶10 For her part, Mother testified that she opposed visitation because the child had been through trauma therapy and Mother "believe[d] that [visitation] would cause emotional harm and distress" to the child because they were "practically not even acquaintances, but strangers to her." She also testified that she didn't think Grandparents had the child's best interests in mind because they "trivialized" her concerns about Father and tried to mediate between the parents to keep things "out of the [c]ourts because [Father] had a past with the [c]ourts." Mother was concerned Grandparents would allow the child to have contact with Father during their visitation "because they protected him in the past" by dismissing her concerns about him. She confirmed that: (1) Grandparents wanted to have contact with the child; (2) it wasn't their fault that they didn't see her more regularly; (3) she believed they loved the child; and (4) "when they saw her or had contact with her that they treated her with kindness and love and appropriate care."

¶11 After considering the evidence, the court ordered that "the Grandparents shall have four (4) unsupervised weekend visits a year in Arizona," "the child shall have telephone/video calls with Grandparents for up to 15 minutes once a month on a date/time mutually agreed upon by the Mother and the Grandparents," and "the Grandparents shall be permitted to send the child appropriate letters and packages if they choose." It gave special weight to Mother's opinion as a fit parent but found by clear and convincing evidence that "Grandparents have rebutted that presumption by establishing that visitation . . . is in the child's best interest." To reach this conclusion, the court considered Grandparents' historical relationship with the child, Grandparents' motivation in seeking visitation, Mother's motivation in objecting, and the quantity of visitation time Grandparents requested alongside any adverse impact to the child's customary activities.

¶12 Mother timely appealed and we have jurisdiction. A.R.S. §§ 12-120.21(A)(1), -2101(A)(1).

**DISCUSSION**

**¶13** To start, Grandparents didn't file an answering brief. If an appellant's opening brief and the record reveal a debatable question and no good cause appears for the appellee's failure to file, we will generally "treat the failure to file an answering brief as a confession of error." *Tucson Ests. Prop. Owners Ass'n v. Jenkins*, 247 Ariz. 475, 477–78 ¶ 6 (App. 2019); *see also Navarro v. State*, 32 Ariz. 119, 120–21 (1927). We decline to do so here because this case implicates the best interests of a child. *See In re Marriage of Diezsi*, 201 Ariz. 524, 525 ¶ 2 (App. 2002). And, as explained below, the record resolves the issues Mother raises, *see Honsey v. Honsey*, 126 Ariz. 336, 337 (App. 1980); *Air E., Inc. v. Wheatley*, 14 Ariz. App. 290, 294 (1971) (holding that an issue isn't debatable when the record "clearly" resolves it); *see also Lothman v. Lothman*, 11 Ariz. App. 419, 420–21 (1970) (affirming the portion of a judgment raising no debatable issue on appeal).

**¶14** A third party may petition for visitation with a child in several circumstances, including when "[t]he child was born out of wedlock and the child's legal parents are not married to each other at the time the petition is filed." A.R.S. § 25-409(C)(2). "We will not disturb the superior court's visitation ruling absent an abuse of discretion." *Douros v. Morse*, 258 Ariz. 546, 550 ¶ 13 (App. 2024).

**¶15** Mother argues first that "[t]he Superior Court's Findings Were Legally Insufficient to Rebut the Fit-Parent Presumption Under A.R.S. § 25-409(E) and Flanigan." The court must consider if visitation with the third party is in the child's best interests and "shall give special weight to the legal parents' opinion of what serves their child's best interests." A.R.S. § 25-409(E). "[T]o recognize the special weight afforded a fit parent's decision on third-party visitation, the individual requesting such visitation must show by clear and convincing evidence that the visitation is in the child's best interests, and the court must find and explain why the fit parent's best-interests determination is incorrect." *Flanigan v. Kittelson*, 260 Ariz. 498, 502 ¶ 2 (App. 2025). It must also consider all relevant factors including:

1. The historical relationship, if any, between the child and the person seeking visitation.

2. The motivation of the requesting party seeking visitation.

3. The motivation of the person objecting to visitation.

4. The quantity of visitation time requested and the potential adverse impact that visitation will have on the child's customary activities.

A.R.S. § 25-409(E).

**¶16**  The court here gave appropriate "special weight" to Mother's objection to Grandparents' visitation, A.R.S. § 25-409(E), and explained why Mother's best-interests determination was flawed, *Flanigan*, 260 Ariz. at 502 ¶ 2. It considered Mother's opinion and objection's basis and found that her belief that Grandparents "failed to support her or failed to prioritize the needs of the child in the past" had "negatively impacted her judgment regarding what is in the child's best interest."

**¶17**  The court also properly applied § 25-409(E)'s four relevant factors, finding by clear and convincing evidence that visitation was in the child's best interest. The court found that: (1) Grandparents had a historical relationship with the child; (2) Grandparents' motivation was for the child to have a loving and supportive relationship with them and "know that she can count on them"; (3) Mother's motivation in objecting was that she did not believe Grandparents took her allegations seriously and prioritized Father over the child; and (4) Mother objected to visitation as a whole and didn't "express specific concern about the [quarterly] schedule requested by the Grandparents or indicate it would negatively impact her routine." A.R.S. § 25-409(E). And though Mother also argues "The Court Failed to Address Admitted Trauma-Related Evidence," the court's order shows it considered the evidence, including Mother's testimony about the child doing trauma therapy.

**¶18**  The record supports the court's findings, *see supra* ¶¶ 7–9, and we don't reweigh the evidence on appeal. *Kim v. Pak*, 258 Ariz. 594, 596–97 ¶ 7 (App. 2024). We also defer to the court's credibility determinations. *Id.*; *see also Hurd v. Hurd*, 223 Ariz. 48, 52 ¶ 16 (App. 2009) ("Even though conflicting evidence may exist, we affirm the trial court's ruling if substantial evidence supports it."). The court didn't abuse its discretion. *Douros*, 258 Ariz. at 550 ¶ 13.

**¶19**  Mother also argues "[t]he Superior Court Abused Its Discretion by Rejecting the Court-Appointed Therapeutic Structure." She points to the therapeutic interventionist's report from three years earlier recommending gradual "introduction of grandparents" as appropriate "[w]hen Father has demonstrated a regular and consistent pattern of visits." And she argues that the court erred by not explaining why it

departed from the therapeutic interventionist's recommendation. But the report she cites was several years old and wasn't prepared in response to Grandparents' petition for visitation. Beyond that, nothing required the court to follow an interventionist's previous report. *See, e.g.*, A.R.S. § 25-409(E). Above all else, the court considered testimony about the therapeutic interventionist's report and noted that it "was years ago" and Grandparents "don't really have control over" whether Father visited the child. The court weighed the report along with the other evidence, *Kim*, 258 Ariz. at 596–97 ¶ 7, and didn't abuse its discretion by departing from the years-old recommendation without further explanation, *Douros*, 258 Ariz. at 550 ¶ 13.

**¶20**        Finally, Mother claims the court improperly admitted evidence of letters Grandparents sent the child. She argues the court erred in considering them part of Grandparents' historic relationship because they didn't include "proof the child received or recognized them." The record supports that Mother was mistaken about the exhibit containing the letters not being disclosed. *See supra* ¶ 8. And Grandmother testified that, although she wasn't sure the child saw their letters, Mother's grandfather (the child's maternal great-grandfather) told her they received "every single . . . package[]." The court could reasonably consider this as evidence Grandparents attempted to continue an ongoing relationship with the child over the years, and—again—we don't reweigh the evidence on appeal. *Kim*, 258 Ariz. at 596–97 ¶ 7. The court didn't err in admitting this evidence.

**CONCLUSION**

**¶21**        We affirm.



**MATTHEW J. MARTIN • Clerk of the Court**
**FILED**:              JR

7